IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Christine Crowley,　　　　　　　　　　　　　Case No. 3:12 CV 369

　　　　　　　　Plaintiff,　　　　　　　　　MEMORANDUM OPINION
　　　　　　　　　　　　　　　　　　　　　　AND ORDER
　　　　-vs-
　　　　　　　　　　　　　　　　　　　　　　JUDGE JACK ZOUHARY
St. Rita's Medical Center, et al.,

　　　　　　　　Defendants.

## INTRODUCTION

Plaintiff Christine Crowley filed this action alleging Defendant St. Rita's Medical Center ("St. Rita") terminated her employment because she raised concerns about Defendant John Renner, St. Rita's chief financial officer, intentionally falsifying corporate financial documents. She asks this Court to recognize a new public policy exception to Ohio's employment at-will doctrine in R.C. § 1702.54, and to find that St. Rita unlawfully terminated her employment. Defendants moved for summary judgment (Doc. 32), arguing that R.C. § 1702.54 does not evince a sufficiently clear public policy to create an exception to the employment at-will doctrine and, even if it does, Plaintiff was fired for permissible performance reasons. What Plaintiff views as intentional falsification of corporate documents, Defendants characterize as merely an accounting dispute between Plaintiff and Renner. Plaintiff opposes the Motion (Doc. 35), attaching a signed but unnotarized affidavit. Defendants move to strike or in the alternative object to this affidavit (Docs. 38 & 39). Both Motions are fully briefed and pending before this Court, which held a record hearing on the matter on February 21, 2013. This Court has diversity jurisdiction.

**BACKGROUND**

St. Rita is an Ohio not-for-profit corporation operating medical treatment facilities throughout Ohio, including an acute care hospital in Lima, and is owned by Catholic Health Partners ("CHP"), which operates regional health systems in Ohio and Kentucky (Doc. 1). In December 2008, St. Rita hired Plaintiff as its Administrative Director of Revenue Cycle with responsibility for collecting revenue from patient accounts, developing managers, and cultivating high morale (Doc. 1-1; Crowley Dep. 46–47). From August 2009 until her termination, Plaintiff reported to Renner (Renner Dep. 5).

During her employment, Plaintiff exercised certain responsibilities over patient accounts: she submitted certain financial information to corporate headquarters, attended monthly revenue meetings, and met regularly with Renner to discuss the department and her performance. One area to which Plaintiff was exposed was accounts receivable ("AR"), which represents the money owed to St. Rita by patients, insurers, and the federal government (Crowley Dep. 141). The AR's value is reflected in St. Rita's monthly financial statements, which can be used by bondholders, banks, and other interested parties to assess St. Rita's financial position and performance (Rieger Dep. 70; Platzke Dep. 29). Some quantity of the AR is comprised of "bad debts" which are considered unlikely to be collected based on the amount of time the debts have been outstanding.

To collect revenues, St. Rita's policy is to send debts outstanding for 45 days to collection agencies, which are then paid a contingency fee for any amounts collected (Youngblood Dep. 45). If, after 120 days payment is not received, the accounts are treated as "bad debts" -- a designation determined by St. Rita's chief financial officer. This is an informal guideline and typically St. Rita is able to recover approximately twelve to fourteen percent of these delinquent accounts (Crowley Dep. 63, 107, 123–24). During Plaintiff's employment, St. Rita shifted from using one collection

agency to five different agencies handling various aspects of the collection process (*id.* at 61). This changeover delayed the timely collection of revenue, which in turn increased the amount of "bad debts" during 2009–10 (*id.* at 63–64).

St. Rita uses software known as Crowe Analytics to ensure sufficient reserves are assigned to cover bad debts based on past collection history (Rieger Dep. 49; Renner Dep. 63). Depending on this history, bad debts are automatically and fully reserved if they have been outstanding between 180 and 365 days (Crowley Dep. 84–85; Rieger Dep 81; Youngblood Dep. 63), and the reserves automatically reconcile with the amount of bad debt at some point in the fiscal year (Rieger Dep. 81). This reserve methodology and its valuation of AR is audited twice annually by an outside firm, and the auditors reported no issues in 2009 or 2010 (Rieger Dep. 65, 107, 111).

Variances arise over the course of a fiscal year between revenue and bad debts such that reserves may require adjusting (Youngblood Dep. 53–54). St. Rita's financial team held monthly "net revenue calls" during which all financials were discussed, including the amounts and impacts of AR, bad debts, and reserves (Rieger Dep. 37–38; Crowley Dep. 65–68). It was during these calls, and other interactions with Renner and others, that Crowley expressed concern regarding the amount of cash reserves relative to bad debts. She claimed that the numbers published in the financial statements did not match up with "dashboard" data, a document she submitted monthly (Crowley Dep. 70–71). Because the numbers did not match up, Plaintiff believed Defendants were publishing inaccurate monthly financial statements.

Unlike the financial statements, though, the dashboard is an unpublished internal document that does not include information related to net revenues or reserves -- it is useful in assessing the performance of patient accounting (for which Plaintiff was responsible), but not useful in determining

3

Defendants' financial strength (Rieger Dep. 55, 59, 64). St. Rita's director of finance, Tim Rieger, who prepares the financial statements and is a certified public accountant, attempted to explain the distinctions to Crowley, but was unsuccessful (Rieger Dep. 71–74). Plaintiff alleges she began receiving bad performance reviews once she disagreed with Renner on how St. Rita calculated its reserves. She also alleges, and Defendants deny, that Renner at least once asked Plaintiff to modify the information in her dashboard document to match up with the data on the financial statements prepared by Rieger (Crowley Dep. 78–80). The simmering dispute between Plaintiff and Renner over reserves came to a head following a June 6, 2010 report to the executive team where Defendants wrote off approximately $10 million (Crowley Dep. 43). Plaintiff blamed the loss on Renner's decisions regarding reserve amount, and reported her impression to Renner, as well as Deborah Youngblood, a corporate vice president (*id.* at 42–43, 140–41).

Separate from the dispute over AR, Plaintiff's employment with St. Rita was relatively tumultuous. Several St. Rita employees testified they found Plaintiff to be an ineffective manager from early in her tenure (Youngblood Dep. 24). Some found Plaintiff to be unreliable (Cason Dep. 41–42), or unwilling to make changes regarding her management of accounts (Renner Dep. 47; Youngblood Dep. 29–30, 64–66). Further, Rieger questioned her ability to understand financial reporting (Rieger Dep. 40–41) and differed with her regarding reporting of financial information (*id.* at 38). Her performance reviews reflected these issues, and her overall performance grade for 2009 was noted as "needs improvement" (Ex. 7 at 1). Defendants alleged, and Plaintiff does not appear to dispute, that she walked out in the middle of a performance review in which Renner discussed the reasons for the "needs improvement" grade (Renner Dep. at 153); and walked out again at a June 2010 meeting, during which her employment was terminated. Plaintiff filed this lawsuit in February 2012.

4

#### SUMMARY JUDGMENT STANDARD

Pursuant to Federal Civil Rule 56(a), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When considering a motion for summary judgment, the court must draw all inferences from the record in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

#### DISCUSSION

Because this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 over this state law claim for wrongful termination, it must apply Ohio law "in accordance with the then controlling decision of the highest state court." *Grantham & Mann, Inc. v. Am. Safety Prods., Inc.*, 831 F.2d 596, 608 (6th Cir. 1987). In the absence of an Ohio Supreme Court decision addressing the issue raised here, this Court must decide the case using "all relevant data," including decisions of the state appellate courts. *Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001).

**The *Greeley* Claim**

Employment in Ohio is governed, with some exceptions, by the employment at-will doctrine. *Leininger v. Pioneer Nat'l Latex*, 115 Ohio St. 3d 311, 312 (2007). This generally means that either the employee or employer may terminate employment for any reason at any time and that an

5

employee may not sue the employer for wrongful discharge. *Avery v. Joint Twp. Dist. Mem. Hosp.*, 286 F. App'x 256, 260 (6th Cir. 2008). However, Ohio recognizes a tort for wrongful discharge, known as a *Greeley* claim, where the discharge violates a clear public policy. *Pytlinski v. Brocar Prod., Inc.*, 94 Ohio St. 3d 77, 78 (2002) (citing *Greeley v. Miami Valley Maint. Contrs., Inc.*, 49 Ohio St. 3d 228 (1990)). To fall within this exception, Plaintiff must establish:

1. Clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element);

2. Dismissing employees under circumstances like those involved in her dismissal would jeopardize the public policy (the *jeopardy* element);

3. Her dismissal was motivated by conduct related to the public policy (the *causation* element); and

4. Defendants lacked an overriding legitimate business justification for the dismissal (the *overriding justification* element).

*Painter v. Graley*, 70 Ohio St. 3d 377, 384 n.8 (1994). While the clarity and jeopardy elements are questions of law for the court to decide, the causation and overriding justification elements are for the fact-finder. *Collins v. Rizkana*, 73 Ohio St. 3d 65, 70 (1995).

Plaintiff alleges Defendants' decision to terminate her employment violates Ohio public policy enshrined in R.C. § 1702.54, which provides in part:

(A) No officer, director, employee, or agent of a corporation shall . . . with intent to deceive:

(1) Make, issue, deliver, transmit by mail, or publish any prospectus, report, circular statement, balance sheet, exhibit, or document, respecting . . . assets, liabilities, earnings, or accounts of, a corporation, that is false in any material respect, knowing the same to be false;

(2) Having charge of any books, minutes, records, or accounts of a corporation, make therein any entry that is false in any material respect, knowing such entry to be false, or remove, erase, alter, or cancel any entry therein, knowing that the entries resulting therefrom will be false.

Because the Ohio Supreme Court has not ruled whether R.C. § 1702.54 gives rise to a *Greeley* claim, this Court looks to all relevant data in making its decision.

### *The Clarity Element*

Clear public policy justifying an exception to the employment at-will doctrine may be found in federal or state constitutions, statutes, administrative rules and regulations, and the common law. *Sutton v. Tomco Machining, Inc.*, 129 Ohio St. 3d 153, 157 (2011). Where the clear public policy is based on statute, the Ohio Supreme Court looks to the legislature's "intent[] in enacting it" by first looking to the statutory language and the purpose it seeks to accomplish. *Id.*

As noted above, R.C. § 1702.54 prohibits the falsification of corporate documents when done with the intent to deceive. The statute does not impose a duty on employees to report violations of the statute, nor does it expressly provide protection for employees against retaliatory actions by the employer if the employee does report, either to management or to an outside agency, a good faith belief that the statute is being violated. In the abstract, this general prohibition manifests the public policy of Ohio not to condone deliberate, deceitful corporate fraud -- surely an important policy. But the inquiry does not end just because this Court does or does not agree with the policy in R.C. § 1702.54. Indeed, courts must take care not to allow their own policy preferences to override legislative enactments.

Courts in Ohio, including federal courts interpreting Ohio laws, have not spoken with unanimity regarding the types of statutes that may give rise to a *Greeley* claim. Several courts have specifically required a statute underlying a *Greeley* claim to parallel the public policy set forth in Ohio's whistleblower statute, R.C. § 4113.52. *See, e.g.*, *Hale v. Volunteers of Am.*, 158 Ohio App. 3d 415, 427 (Ohio Ct. App. 2004). In order to parallel the whistleblower policy, courts have found that the statute must be one that "imposes an affirmative duty on the employee to report a violation,

7

[or] specifically prohibit[s] employers from retaliating against employees who had filed complaints, or that protect[s] the public's health and safety." *Dean v. Consol. Equities Realty #3, L.L.C.*, 182 Ohio App. 3d 725, 729 (Ohio Ct. App. 2009).

For example, the plaintiff in *Dean* was terminated two days after reporting to his boss potential fraud in an application for credit to buy a car. *Id.* at 726–27. Plaintiff argued that Ohio has a clear public policy against fraud, and had enacted many antifraud statutes, such as R.C. § 2921.13(A)(8), which criminalizes "knowingly mak[ing] a false statement . . . to induce another to extend credit to . . . the offender . . . when the person to whom the statement is directed relies upon it to that person's detriment." While acknowledging Ohio's general policy against fraud, the court granted summary judgment to the defendant, finding the clarity element had not been met because the statute neither required the plaintiff to report the allegedly fraudulent conduct, nor prohibited defendant from retaliating against plaintiff. *Dean*, 182 Ohio App. 3d at 729. Similarly, the court in *Hale* found no *Greeley* claim, in part because the underlying administrative regulations governing the operation of residential drug treatment centers did not require reporting or provide protection against retaliation. 158 Ohio App. 3d at 428.

Others courts, including the Ohio Supreme Court, while not expressly limiting statute-based *Greeley* claims to those paralleling the whistleblower statute, have in effect permitted such claims only where the statute includes a duty to report, retaliation protection, or conduct affecting the public or employee health and safety. For example, a recent decision of the Ohio Supreme Court, *Sutton v. Tomco Machining Co.*, 129 Ohio St. 3d 153 (2011), found the clarity element satisfied where the underlying statute prohibited retaliation against employees who pursued workers' compensation claims. *Id.* at 160 (expanding the protections of the statute to include injured employees who experienced a retaliatory employment action between the time of injury and the time of filing for

benefits). Similarly, in *Dolan v. St. Mary's Mem'l Home*, 153 Ohio App. 3d 441 (Ohio Ct. App. 2003), the court found a clear public policy embodied in Ohio's nursing home patients' bill of rights, codified in R.C. § 3721.10–17, which protects the health and safety of patients and also prevents retaliation against employees who report violations of patients' rights. *Id.* at 445–46. Finally, in *Kulch v. Structural Fibers, Inc.*, 76 Ohio St. 3d 134 (1997), the court found the clarity element satisfied where the public policy at issue was employee safety and the plaintiff invoked the federal OSHA statute, 29 U.S.C. § 660(c), as well as related Ohio laws. 76 Ohio St. 3d at 152–53.

Still other courts have taken a more expansive view of the clarity element. For example, Plaintiff points to a decision, from this federal district, finding a clear public policy under the Federal Corrupt Practices Act (FCPA) against bribery of foreign officials. *Kirk v. Shaw Envtl., Inc.*, 2010 WL 1387887, at *5 (N.D. Ohio 2010). The court in *Kirk* did not address, and it does not appear the defendant raised, the question of whether the underlying policy needs to parallel the whistleblower policies or protect employee or public safety. Instead, the court found the FCPA itself fully and independently supported a *Greeley* claim, and cited several decisions from state courts ruling similarly. In addition, other Ohio appellate courts have found the clarity element satisfied where: an employee was fired for refusing to ship nonconforming products to a customer in violation of public policy embodied by the Uniform Commercial Code, *Zajc v. Hycomp, Inc.*, 172 Ohio App. 3d 117, 123 (Ohio Ct. App. 2007), or for consulting with an attorney, in violation of the right to consult an attorney, a fundamental right of our justice system, *Simonelli v. Anderson Concrete Co.*, 99 Ohio App. 3d 254, 259 (Ohio Ct. App. 1994). The policies in *Zajc* and *Simonelli* neither required reporting nor expressly protected against retaliation.

Plaintiff also points to *Avery v. Joint Twp. Dist. Mem'l Hosp.*, 286 F. App'x 256 (6th Cir. 2008), which found the clarity element satisfied where the asserted public policy prohibited

9

falsification of medical records. *Id.* at 264. While it is true that the administrative regulations underlying that claim did not require reporting or prohibit retaliation, they are aimed at protecting public safety, namely by requiring medical personnel to document patient information accurately. In addition, defendant argued the claim should fail because plaintiff did not comply with the procedural requirements in the whistleblower statute. The court rejected this position, finding that plaintiff's noncompliance with these procedural requirements is not an absolute bar to bringing a *Greeley* claim, but it did so in the context of a public policy aimed at protecting public safety. *Id.* Thus, *Avery* does not conflict with decisions such as *Dean* and *Hale*, which also do not hold that a plaintiff must adhere to the procedures in the whistleblower statute; rather, they hold the underlying policy must either require reporting, protect against retaliation, or protect employee or public safety.

Similarly, an Ohio appellate court found the clarity element satisfied where an employee was fired after reporting that her boss imminently was going to drive under the influence of alcohol in violation of Ohio's policy against drunk driving. *Stephenson v. Litton Sys., Inc.*, 97 Ohio App. 3d 125, 129 (Ohio Ct. App. 1994). Here again, although there was no reporting requirement or retaliation protection, the policy at issue was aimed at protecting public safety and as such does not conflict with cases such as *Dean* and *Hale*.

This Court finds more persuasive the reasoning of the Ohio courts that require the public policy invoked in a *Greeley* claim to parallel the policies underlying the whistleblower statute or protect employee or public safety. The courts of Ohio generally have found that *Greeley* claims cannot lie with every public policy, even "good" ones, and appropriately so. Without these limitations, *Greeley* claims could evolve from exceptions to the employment at-will doctrine to the rule itself. Here, R.C. § 1702.54 neither requires reporting, nor protects against retaliation, nor protects employee or public health and safety. This statute represents a general prohibition against

10

deliberate and deceitful falsification of corporate documents -- undoubtedly an important public policy, but not one that gives rise to a *Greeley* claim given the full weight of Ohio case law discussed above.

### *The Jeopardy Element*

Because this Court has rejected Plaintiff's clarity argument, summary judgment can be granted on that ground alone; however, even if Plaintiff had shown that R.C. § 1702.54 evinces a sufficiently clear public policy to allow a *Greeley* claim, Plaintiff here does not satisfy the jeopardy element.

A jeopardy analysis requires a court to determine whether dismissal of an employee jeopardizes a clear public policy. *See Sutton*, 129 Ohio St. 3d at 160–61. To satisfy the jeopardy element, a plaintiff's conduct need not be based on a correct belief the defendant is violating a public policy; rather, a plaintiff needs only a good faith belief his complaint is valid. *See Kulch*, 78 Ohio St. 3d at 324. Further, courts inquire whether there exists "any alternative means of promoting the particular public policy to be vindicated by a common-law wrongful-discharge claim." *Wiles v. Medina Auto Parts*, 96 Ohio St. 3d 240, 244 (2002). Although Ohio state courts have not done so, the Sixth Circuit has applied a three-part analysis in which the court (1) determines the kind of conduct necessary to further the clear public policy; (2) decides whether plaintiff's conduct is within the scope of what the policy protects; and (3) considers whether employees would be discouraged from engaging in similar conduct by the threat of dismissal. *Avery*, 286 F. App'x at 264; *Himmel v. Ford Motor Co.*, 342 F.3d 593, 599 (6th Cir. 2003).

Plaintiff argues she satisfies the jeopardy element because (1) reporting the intentional falsification of corporate financial documents is necessary to vindicate the policy against such falsification; (2) her conduct -- raising her concerns with Renner, Youngblood, and others -- is the kind of conduct necessary to vindicate the policy; and (3) the dismissal of corporate insiders like

11

herself would dissuade other employees from reporting such falsifications in the future. While her first point is well taken, but ultimately unavailing because R.C. § 1702.54 does not give rise to *Greeley* claims, this Court disagrees with her assessment of points two and three.

If R.C. § 1702.54 evinced a clear public policy for *Greeley* purposes, dismissal of Plaintiff would not jeopardize that policy. The crux of the issue here is that Plaintiff, who is *not* an accountant, disagreed with numbers included in published financial statements based on data in her personal dashboard documents. Because the numbers did not match up, she believed Defendants were willfully misleading the public by publishing inaccurate financial data. However, there is no dispute that, among other things: (1) Plaintiff knew there would be some added variance in the AR regarding bad debts during the period Defendants began sending its delinquent accounts to five different collections agencies rather than one; (2) Plaintiff's dashboard numbers were raw, unpublished, and had not gone through the Crowe system for calculating reserves; (3) Plaintiff was not directly involved in the preparation of financial statements; (4) the accounting department prepared financial statements in accordance with generally accepted accounting principles (Rieger Dep. 13); (5) the financial statements and their method of preparation were audited regularly; and (6) the published financial statement for May 2010, the period in which Plaintiff alleges she had a good faith belief Defendants were intentionally falsifying corporate documents, acknowledged an 800% variance in bad debt over May 2009 (Ex. 14). These undisputed facts cast sufficient doubt on Plaintiff's asserted good faith belief that Defendants were purposefully, and with the intent to deceive, falsifying corporate financial documents. Without a good faith belief Defendant was violating a clear public policy, Plaintiff cannot satisfy the jeopardy element. If anything, Plaintiff's conduct here demonstrates her dispute with Renner and Rieger was over accounting principles in which she had no expertise. It cannot be that

12

the jeopardy element would be satisfied any time an employee disagrees with her employer and invokes public policy, especially in a technical area in which she lacks expertise.

Similarly, Plaintiff's reference to corporate insiders does not help her case. She argues that insiders play a critical role in exposing corruption or fraudulent behavior -- this is true. However, she was not the kind of insider who would be protected if R.C. § 1702.54 gave rise to *Greeley* claims. Although she attended monthly revenue meetings and was involved to some extent with those who did prepare the financial reports, she was unaware of how the raw data to which she was exposed related to the ultimate financial statements which were in turn produced in accordance with generally accepted accounting principles. As such, she was not an insider regarding Defendants' publication of financial information. This is not a failing on Plaintiff's part -- it illustrates only that she lacked the status of one who would be protected for reporting alleged violations. Dismissal given her particular circumstances could not be said to dissuade employees from reporting suspected violations in the future.

Finally, although the law is clear that *Greeley* claims may be brought under public policies wholly separate from the whistleblower statute, here, that statute would have been an alternate means of attempting to vindicate the purpose of R.C. § 1702.54. As both parties note, Plaintiff did not pursue a whistleblower claim.

### *Causation and Overriding Justification Not Reached*

Because this Court finds, as a matter of law, Plaintiff does not satisfy either the first or second *Greeley* elements, there is no need to discuss the third and fourth elements of this claim. This Court notes, however, that although Defendants have put forward significant evidence in support of the overriding business justification for terminating Plaintiff's employment, remaining questions of material fact likely would preclude summary judgment if Plaintiff had a valid *Greeley* claim. For

13

example, the closeness in time between Plaintiff's termination on June 10 and the June 6 report of a $10 million loss she attributed to Renner's calculation of reserves leaves open whether Plaintiff could establish the causation element, or whether Defendants could persuade that her insubordination was the overriding reason for termination. These questions need not be answered now.

### Objection to Plant Affidavit

Defendants move to strike or in the alternative object to the affidavit of Lisa Plant (Docs. 38 & 39) filed by Plaintiff along with her opposition to the summary judgment Motion because it was not notarized (*see* Doc. 35-1). In response, Plaintiff filed a notarized version of the affidavit which does not differ in substance from the original filing (Doc. 40-1). This Court views the minor technical deficiency with the initial unnotarized affidavit curable by the subsequent filing, and finds Defendants are not prejudiced by this Court's consideration of the notarized version. Accordingly, Defendants' Objection is denied.

### CONCLUSION

Because Plaintiff's firing did not violate a clear public policy, Defendants' Motion for Summary Judgment (Doc. 32) is granted as to Count I of the Complaint. Count II is not a separate claim, but rather a request for punitive damages inextricably tied to Count I, and therefore it too is dismissed. No other claims remaining, this Court enters final judgment for Defendants.

IT IS SO ORDERED.

    s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

March 20, 2013